## Kamel's Estate

Before Van Dusen, P. J., Stearne, Sinkler, Klein, and Ladner, JJ.

*Allen J. Levin,* for accountant.

*Delbert T. Kirk,* for exceptant.

*Joseph Gross,* for assignee.

*Knox Henderson,* for Land Title Bank & Trust Company.

LADNER, J., June 20, 1941.—Decedent before his death conveyed three contiguous properties (1102 Parrish Street, 832-34 North Eleventh Street, Philadelphia) to the Philadelphia Housing Authority pursuant to an agreement of sale in the form of an accepted option requiring the delivery of a good and marketable title, clear of encumbrance, and with general warranty. The purchaser applied to the Land Title Bank & Trust Company (hereinafter referred to as title company) for title insurance. The settlement was made at the title company November 30, 1939, and as stated by its clerk, after all deductions had been made from the purchase price, decedent was shown to have been entitled to a net sum of $2,472.81. Two checks totaling this amount were drawn December 4, 1939, by the title company to the order of decedent, but as he died on the day of settlement the checks were received and collected by his administrator, who was appointed December 12, 1939. The proceeds were deposited in the administration account.

Some time after the checks were received and collected, the title company discovered that its title officer

had failed to certify on the settlement certificate that one of the properties conveyed by decedent (1102 Parrish Street) was still subject to the lien of a mortgage, on which there was a balance due of $4,277.50. This mortgage had been made and executed by decedent in 1928 to the Du-Well B. & L. Association, mortgagee, and by mesne assignments became vested in the Corn Exchange National Bank, the holder thereof at the time of the settlement. This mortgage, for brevity, will hereinafter be referred to as the "Corn Exchange mortgage." The Corn Exchange mortgage was originally a blanket mortgage, and covered not only 1102 Parrish Street but also 832-834-36 North Eleventh Street. It was, however, only a second lien on these properties, being subject to separate first mortgages on each of the four properties.

It appears the prior mortgages on the three North Eleventh Street properties were foreclosed in 1932, and the sheriff's sale which followed divested the lien of the Corn Exchange mortgage thereon. The title examiner of the title company included the Corn Exchange mortgage in his brief or abstract of title, but the title officer, according to the testimony, erroneously assumed that the 1932 foreclosures applied to all four properties, and that the lien thereof on property 1102 Parrish Street was divested also. He failed, therefore, to certify it on the settlement certificate (issued in June 1939) as an existing lien, and consequently no provision was made for it at the settlement.

It appears also that the only lien certified on 1102 Parrish Street was a first mortgage of $1,600, and this decedent caused to be satisfied of record on October 26, 1939, about a month before the settlement. As a result of this satisfaction the Corn Exchange mortgage, though discharged against the three North Eleventh Street properties, became a first lien on the Parrish Street property. Its existence as a lien was not called to the attention of decedent either by the settlement certificate or at the time of the settlement.

Just when the error was discovered, the testimony does not disclose; but it does show that, on October 4, 1940, about eleven months after the settlement, the title company took an assignment from the Corn Exchange of its mortgage for a recited consideration of $2,472.81, the exact amount of balance which had been paid to decedent's estate.

At the audit the title company, showing these facts, presented two alternative claims. The first was, that having paid the sum of $2,472.81 to decedent under a "mistake of fact," it was entitled to have an award not merely as a general creditor but of the specific funds traced into the administrator's possession, on the theory of a constructive trust. The alternative claim was made as a general creditor for the entire balance ($4,277.50) due on the Corn Exchange mortgage assigned to it.

The learned auditing judge allowed the first claim to the extent of the whole balance of $1,903.40 in the administrator's hands on the ground that a constructive trust arose by reason of the payment under a mistake of fact. To this ruling exceptions were filed by a general creditor, the estate being insolvent.

To sustain its claim to an award of the entire balance in the administrator's hands in derogation of the rights of other creditors, the title company must do more than trace the funds into the hands of the administrator. Even the insolvency of a debtor will not itself serve to convert him into a constructive trustee: A. L. I. Restatement of Restitution, §160, com. f. Circumstances must be shown from which a constructive trust can be raised, and this is the real question presented for our consideration. Are there such circumstances here? A clear understanding of the legal rights and the relations of the several parties involved points the answer to the question.

The title company, under the facts here shown, was the agent employed by the purchaser as its conveyancer to make searches, conduct the settlement on its behalf, and to insure the title conveyed by decedent. This is the

usual capacity in which a title company acts: Gerhringer v. Real Estate-Land Title & Trust Co., 321 Pa. 401. As the agent of its principal (the purchaser) it has no separate, independent contractual relation with the vendor. It paid out none of its *own* funds; it distributed merely the purchase money placed in its hands for that purpose by its principal. Decedent owed no duty to it separate and apart from any duty he owed to the purchaser. If the mistake of the title company was due to negligence in making searches, it was liable to its principal for the loss incurred by its principal: Bodine v. Wayne Title & Trust Co., 33 Pa. Superior Ct. 68; Petroleum, etc., Co., v. Guarantee Title & Trust Co., 26 Dist. R. 297. Under the policy issued it was also liable to its principal as insurer: Narberth B. & L. Assn. v. Bryn Mawr Trust Co., 126 Pa. Superior Ct. 74; and as such, may claim its insured's rights as subrogee. Its right to pursue any action or any recovery against the vendor must therefore be tested by the rights and remedies which its principal or its insured had.

What are these rights? It is definitely settled in Pennsylvania that the recording system puts a purchaser of real estate on notice of everything in the chain of title that the record contains, and this he had the burden of ascertaining for himself. In Frowert's Estate, 12 Phila. 148, this court, speaking through President Judge Hanna, said that it is not the duty of the vendor "to furnish the vendee with a brief or abstract of title, in the absence of any agreement to that effect: *Whitaker* v. *Williams*, 7 Legal and Insur. Rep. 14 . . . the burden of proving the title to be defective is on the purchaser: *Espy* v *Anderson*, 2 Harris 308. . . .

"Should, however, the title be defective or encumbered, and deeds, releases, etc., be missing or unrecorded, it is then incumbent upon the vendor, at his own expense, to supply the lost or broken links in the chain of title. But although the vendee or his conveyancer can demand that all deficiencies be supplied, and reasonable objections re-

moved, yet neither has the right, without authority from the vendor, to perform the labor and necessary services, and claim from him compensation therefor."

Since the recording system puts the purchaser on notice of all recorded liens and encumbrances (Lance v. Gorman et al., 136 Pa. 200), and since it is the duty of the purchaser to examine the title of the property about to be conveyed to him for himself, and he is under the duty of pointing out what liens or defects he demands removed (Espy v. Anderson, 14 Pa. 308), it follows logically that if he pays the purchase price and accepts conveyance without doing so he cannot, in absence of fraud or misrepresentation, thereafter recover back the purchase money paid. This has been the consistent ruling of our Supreme Court from the earliest days to the present time. Thus in Kerr v. Kitchen, 7 Pa. 486 (1848), it was held that though a vendee of land may *defend* an action brought for the purchase money by showing existing encumbrances or defect of title, he cannot on these grounds *recover back* the consideration money paid after conveyance made, unless there be a fraud or a warranty. In Fisk v. Duncan, 83 Pa. 196, Mr. Justice Paxson said:

"Where . . . the purchase-money has been paid, and the title proves defective, the vendee in the absence of fraud can recover it back only upon the covenants in his deed." See also Wasserman v. Fleisher, 249 Pa. 29.

If, then, there is no legal right to recover back the purchase money in whole or in part after it has been paid, and there is only an action upon the covenants in the deed, it must follow perforce that no trust can be impressed upon the purchase money paid where there is no legal right to recover it. In this respect equity must follow the law: Bispham on Equity (9th ed.), p. 66, note 1.

It is to meet situations such as this that careful purchasers of real estate always insist on having a covenant of warranty in their deeds, else they would be entirely without remedy in circumstances such as arose in this case. We observe that the purchaser here contracted for

and no doubt received a deed with covenant of general warranty.

Since we have seen that the rights of the title company, whether as agent or conveyancer of the purchaser or as subrogee under its title policy, can rise no higher that that of the purchaser, it follows that no trust can be raised for the title company's benefit. The award of the entire unexpended balance to the title company was therefore error and the exceptions of Benjamin Kimel, a creditor, must be sustained.

We have no doubt that the alternative claim of the title company as to the Corn Exchange mortgage is a proper general claim. In that capacity it is entitled to allowance of its claim for the full balance due on the mortgage, with interest to the date of decedent's death.

The administrator also filed exceptions. While, of course, an administrator ordinarily has no standing to file exceptions to the allowance of claims, his stated purpose was to protect his request for an additional fee for his counsel and for an allowance for the erection of a tombstone. The learned auditing judge, consistent with his ruling to the effect that the balance in the administrator's hands was the property of the title company, refused the requests "pro forma." In the circumstances we follow the customary practice of sustaining the administrator's exceptions pro forma, and recommit the record to the auditing judge so that he may pass on the requested allowances. A decree accordingly is now entered.